**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**WILLIAM JACOB SMITH, SR.,**

        **PETITIONER,**               **CASE NO. 08-11389**

**vs.**                            **HONORABLE DENISE PAGE HOOD**

**JEFF WOODS, WARDEN,**

        **RESPONDENT.**
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS,
GRANTING A CERTIFICATE OF APPEALABILITY, GRANTING _IN FORMA
PAUPERIS_ STATUS ON ANY APPEAL, AND DISMISSING ACTION**

**I.      INTRODUCTION**

      This is a habeas case under 28 U.S.C. § 2254.  Petitioner William Jacob Smith, Sr.

("Petitioner") is confined at the Kinross Correctional Facility in Kincheloe, Michigan.  He claims

ineffective assistance of trial counsel, ineffective assistance of appellate counsel, prosecutorial

misconduct, as well as error for failure to grant various hearings, interwoven with claims of

actual innocence.  For the reasons below, the petition will be denied.

**II.     FACTUAL BACKGROUND**

      On the night of February 19, 1992, the Troy Fire Department responded to a house fire at

the residence of Lee Morningstar.  The house did not appear to be ransacked or broken into, and

Morningstar did not appear to be home.  The next day, the Detroit police investigated a burning

dumpster located in the City of Detroit in which there was a smoldering mutilated body with a

knife lodged in its head.  The body was determined to be that of Morningstar.  An investigation

ensued, three individuals confessed and were charged with the murder of Morningstar. The Troy police later determined that the confessions were false, and the investigation eventually focused on Petitioner.

On May 20, 1993, following a jury trial in the Oakland County Circuit Court, Petitioner was found guilty of first-degree murder, felony murder, armed robbery, and arson in connection with the killing of Morningstar. On June 3, 1993, Petitioner was sentenced to life imprisonment for the first-degree murder and armed robbery convictions, and 13 to 20 years for the arson conviction.

## III. PROCEDURAL HISTORY

The Michigan Court of Appeals affirmed the convictions in an unpublished opinion dated February 16, 1996. All of the issues presented on direct appeal are distinct from the issues raised in this petition. The Michigan Supreme Court denied Petitioner's Application for Leave to Appeal on November 11, 1996.

Several years later, Petitioner filed a Motion for Relief from Judgment before the trial court, raising several federal constitutional issues. In a 21-page opinion dated July 18, 2005, the Oakland County Circuit Court denied Petitioner's Motion for Relief from Judgment, finding that Petitioner had procedurally defaulted on his constitutional claims by failing to raise them on direct appeal. Petitioner filed a delayed application for leave to appeal the Circuit Court's order denying the Motion for Relief from Judgment and a Motion to Remand. The Michigan Court of Appeals issued an order denying leave to appeal and to remand on December 6, 2006. The Court of Appeals denied Petitioner's Motion for Reconsideration in an order issued on January 17, 2007. The Michigan Supreme Court denied Petitioner's application for leave to appeal and to

remand in an order issued on September 10, 2007.  Petitioner filed the instant habeas petition on

April 2, 2008.

## IV.    STANDARD OF REVIEW

Under 28 U.S.C. §2254 (d), a petitioner is not entitled to federal habeas relief with

respect to claims adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Clearly established federal law" means "the holdings, as opposed to the

dicta" of the decisions of the United States Supreme Court "as of the time of relevant state court

decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court decision is "contrary to"

federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case differently than [the Supreme]

Court has on a set of materially indistinguishable facts."  *Id*. at 412-13.  "Under the

'unreasonable application' clause, a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case."  *Id*. at 413.  Under this clause, therefore,

"a federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly. Rather, that application must also be unreasonable."  *Id*. at 411.

## V.    ANALYSIS

### A. Procedural Default

Respondent argues that Petitioner procedurally defaulted his claims.  Petitioner asserts the trial court's reliance on MCR 6.508(D)(3) was insufficient to result in procedural default.

Procedural default occurs when a prisoner fails to present his or her claims in state court. Under the doctrine of procedural default, "in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," a federal habeas court may not review the claims unless the prisoner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice*." Coleman v. Thompson*, 501 US 722, 750 (1991).  A habeas petitioner procedurally defaults a federal constitutional claim if:

> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Tolliver v. Sheets*, 594 F.3d 900, 928 (6th Cir. 2010).

In order to determine whether the state courts have enforced the rule, a federal habeas court must "determine the basis on which the state courts rejected a given claim." *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010).  Because Rule 6.508(D) "has both a procedural and a substantive component," the federal courts must ascertain whether the state post-conviction court has denied review of the claims on the basis of the rule's procedural clause, or on the merits. *See id.* at 12.  Rule 6.508(D) provides:

> The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
>
> (1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on appeal...;

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

      (a) good cause . . . , and
      (b) actual prejudice . . . .

* * *

The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

MCR 6.508 (D). "In some cases, the context of a brief order citing Rule 6.508(D) clearly indicates that the state appellate court is affirming the lower court's determination that a petitioner's claims are procedurally defaulted." *Guilmette*, 624 F.3d at 290 (internal citation omitted). Yet other orders citing Rule 6.508 (D) deny post-conviction relief on the merits. *Id.* "Michigan practice confirms that brief orders citing Rule 6.508(D) in some cases refer to a petitioner's failure to meet his burden on the merits. The procedural default rule stated by Rule 6.508(D)(3) applies only to claims that could have been brought on direct appeal, and thus—by necessity—it does not apply to the claims of ineffective assistance of *appellate* counsel." *Id*. at 291 (emphasis in original). To determine whether form orders citing Rule 6.508(D) refer to procedural default or denial on the merits, a federal habeas court must "look to the last reasoned state court opinion to determine the basis for the state court's rejection" of a prisoner's claim. *Id.*

The trial court's order denying Petitioner's motion for relief was based on procedural default. Although the trial court did reach the merits on some Petitioner's constitutional claims, the court unambiguously cited to, and relied on, subsection 3 of 6.508(D) rather than 6.508(D)

generally.  For each of Petitioner's federal claims, the trial court prefaced its analysis as follows: "Defendant did not raise these issues in the Michigan Court of Appeals.  *Therefore, Defendant must demonstrate good cause and actual prejudice for failure to raise these issues previously.*" App. D to Pet. citing MCR 6.508(D)(3)(a)&(b) (emphasis added).  The *substance* of the trial court's analysis also addressed whether Petitioner demonstrated either cause for failing to raise the claim on direct appeal, or prejudice as a result of his claims being defaulted.  For each claim, the trial court found either a lack of cause or, alternatively, a lack of actual prejudice.

Although the trial court sufficiently invoked MR 6.508(D)(3), the Court will address the merits of Petitioner's federal constitutional claims.

### B.  Prosecutorial Misconduct (Pet. Issue II)

Petitioner presents several claims of prosecutorial misconduct: (1) pre-trial identification procedures concerning the knife, a gun missing from the victim's home, and a 911 call were unduly suggestive, resulting in irreparable misidentification; (2) the pre-trial identification procedures were held in the absence of defense counsel in violation of Petitioner's Sixth and Fourteenth Amendment right to counsel; (3) the prosecution and/or police intentionally suppressed material impeachment evidence concerning the leniency the Troy police requested for several state witnesses for their testimony in violation of Petitioner's right to a fair trial and right of confrontation; (4) the prosecution suppressed material impeachment evidence that its key witness, Mitchell Merrill, was, at the time of trial, a police informant for, and friend of, the lead detective in Petitioner's case; (5) the prosecution suppressed material impeachment evidence concerning a knife seized by police by failing to inform the trial court of it after defense counsel failed to bring it to the attention of the court; and (6) the prosecution offered into evidence false testimony concerning the 911 call.

**1. Unduly Suggestive Identification Procedures (Pet. Issues IIB and IIC)**

**a. Identification Procedures Regarding Murder Weapon and Guns**

Petitioner argues that the pre-trial identification procedures involving the murder weapon, as well as guns that were taken from the victim's home, were unduly suggestive and conducive to irreparable misidentification.

A few days after the fire at the victim's home, the victim's son, David Morningstar, noticed several guns missing from his father's residence. At Petitioner's preliminary examination and trial, prosecution witness, Roger Kirk, offered testimony tending to link Petitioner to a gun that was apparently stolen from the victim's residence. At trial, Kirk also identified a photograph of the actual murder weapon as the same knife that he had seen in Petitioner's possession prior to the date of the murder. Kirk's testimony revealed that he met with the police prior to the preliminary examination to identify photographs of knives, and possibly firearms as well. While the details concerning these identification procedures are not entirely clear from the record, it is clear that the photographic identifications did occur.

Petitioner challenges all identification procedures concerning either the knife, or the guns as unduly suggestive. Concerning the knives, Petitioner challenges the photo identification procedure as unduly suggestive because "there were not multiple knives for the witness to choose from." Pet. at 39.

The Supreme Court has recognized that photographic identification of the accused "is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *United States v. Wade*, 388 U.S. 218, 228 (1967). The accused is denied due process of the law when such an identification procedure is "so unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v.*

7

*Denno*, 388 U.S. 293, 302 (1967). The Supreme Court has not considered "whether its decision

in *Stovall* extends to identification testimony of inanimate objects. Those courts which have

addressed the issue appear to have unanimously held that it does not." *See Smith v. Booker*, 2006

WL 3313763 *5 (E.D. Mich. Nov. 14, 2006)(unpublished)(quotation omitted). The Ninth

Circuit rejected a habeas petitioner's argument that the victim's in-court identification of an

automobile was tainted by suggestive pre-trial identification procedures: "While this argument

deserves credit for creativity, *Stovall* and its progeny do not require car line-ups. There is no

authority holding that a defendant's due process right to reliable identification procedures

extends beyond normal authenticity and identification procedures for physical evidence offered

by the prosecution." *Johnson v. Sublett,* 63 F.3d 926, 931-932 (9th Cir. 1995).

In the case at hand, the identification procedures Petitioner is challenging fall squarely

within the parameters of the holdings discussed above. Prosecution witness Kirk offered

testimony regarding inanimate objects consisting of two knives and a gun. Petitioner has not

offered any authority establishing a constitutional right to reliable identification procedures for

inanimate physical evidence. Because Petitioner has not shown that the trial court's resolution of

this issue was contrary to clearly established federal law, he is not entitled to habeas relief.

### b. Identification Procedures Concerning the 911 Call

Plaintiff also argues that the identification procedures of the 911 tape were unduly

suggestive. For the reasons that follow, this Court disagrees.

At trial, the prosecution admitted into evidence tape of a 911 call in which the caller

asked for directions to the victim's residence on the day of the murder. Prosecution witness Lori

Cunningham, who was personally acquainted with Petitioner, testified that she attended a pre-

trial procedure where she identified the voice of the caller as Petitioner's. At trial, another

prosecution witness also identified the voice as Petitioner's. Petitioner challenges Cunningham's pre-trial identification of the recording as unduly suggestive because there were only two voices on the call, the voice of the caller and that of the operator.

"A witness's voice identification is subject to the same due process analysis as other forms of identification." *United States v. Recendiz*, 557 F.3d 511, 528 (7th Cir. 2009). A conviction based on testimony from a suggestive identification procedure will be set aside if "the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 197 (1972)(internal citation omitted). Assuming a pre-trial identification procedure was suggestive, the question then becomes whether, under the "totality of the circumstances," the identification was nevertheless reliable. *Id*. at 199. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id*. at 199-200.

In the case at hand, Petitioner does not point to any factors other than the number of voices on the call. Even assuming the 911 call was suggestive in light of the totality of the circumstances, it was still arguably reliable. Both witnesses who identified Petitioner's voice on the 911 call were personally acquainted with Petitioner. Petitioner offers no evidence that the witnesses were uncertain as to their identification of Petitioner's voice. Petitioner suggests that the accuracy of the recording is in dispute without proffering specific evidence to call its accuracy into question. Petitioner relies on *People v. Williams* in which the court found a voice identification procedure highly suggestive because the tape only revealed three voices, two of

9

which were the voices of officers.  *People v. Williams,* 244 Mich. App. 533, 543 (2001).  In

*Williams*, however, the victim was attacked by an unknown man whose face was masked.  *Id*. at

535.  In Petitioner's case, both witnesses were personally acquainted with Petitioner and thereby

qualified to identify his voice.  In *Williams*, the court explicitly held that the number of voices on

the recording would not alone establish suggestiveness.  *Id*. at 543.  Under the totality of the

circumstances, it does not appear that the identification procedures of the 911 recording were so

impermissibly suggestive as to create "a very substantial likelihood of irreparable

misidentification."

### 2.  Absence of Counsel During Identification Procedures (Pet. Issue II.D)

Petitioner argues that he was denied due process due to the absence of his trial counsel at

the identification procedures described above, held after his arraignment and appointment of trial

counsel, but prior to his preliminary examination and trial.

A criminal defendant "requires the guiding hand of counsel at every step in the

proceeding against him."  *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963)(internal citation

omitted). In particular, counsel must be present at "every critical stage" of the proceedings

against him, or at "every stage of a criminal proceeding where substantial rights of a criminal

accused may be affected."  *Mempa v. Rhay*, 389 U.S. 128,134 (1967).  Among proceedings

deemed "critical" are some, but not all, identification procedures.  The Supreme Court held "that

the Sixth Amendment does not grant the right to counsel at photographic displays conducted by

the Government for the purpose of allowing a witness to attempt an identification of the

offender." *United States v. Ash,* 413 U.S. 300, 321 (1973).  The Supreme Court stated the same

principle more broadly: "there is no Sixth Amendment right to counsel whatsoever at a post-

indictment photographic display identification."  *Patterson v. Illinois,* 487 U.S. 285, 298 (1988).

In *Ash*, the identification in question involved photographs of suspects, including the defendant. 413 U.S. at 301.  Arguably, witness identification of a criminal suspect is more critical than a procedure in which a potential witness identifies an inanimate object, such as a murder weapon.

In the case at bar, the identification procedures in question occurred after Petitioner's arraignment, and after the appointment of his trial counsel.  Prosecution witness Roger Kirk was interviewed by the Troy Police Department on September 8, 1992, approximately four days after Petitioner's arraignment.  During this interview, Kirk identified photographs of the murder weapon, as well as a gun that had been stolen from the victim's home, as belonging to Petitioner. The Supreme Court has found no right of counsel to attach to a photographic display of criminal suspects.  Petitioner offers no support for the conclusion that the right to counsel attaches to identification procedures involving photographs of murder weapons.  Habeas relief is not appropriate on the basis of this evidence.

### 3. Suppressed *Brady* Materials (Pet. Issues V, VI, IX)

Petitioner makes three arguments in support of his *Brady* claims: (1) the prosecution intentionally suppressed exculpatory evidence by not bringing to the court's attention evidence that it knew was in defense counsel's possession; (2) the prosecution suppressed material impeachment evidence concerning favorable consideration given to prosecution witness Mitchell Merrill; (3) the prosecution suppressed material impeachment evidence that Mitchell Merrill was, at the time of trial, a police informant; and (4) the prosecution suppressed material impeachment evidence concerning favorable treatment two state witnesses received for their testimony.

"Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 73 U.S. 83, 87 (1963).

"*Brady* applies to relevant evidence in the hands of the police, whether the prosecutors knew

about it or not." *Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009). "There are three

elements to a true *Brady* claim: The evidence at issue must be favorable to the accused, either

because it is exculpatory, or because it is impeaching; that evidence must have been suppressed

by the state, either willfully or inadvertently; and prejudice must have ensued." *Strickler v.*

*Greene*, 527 U.S. 263, 281-82 (1999). To establish prejudice, a petitioner must show that there

is "a reasonable probability" that the result of the trial would have been different if the

suppressed evidence had been disclosed to the defense. *Id*. at 289.

### a.  Leniency for Prosecution Witnesses

"It is well established that an express agreement between the prosecution and a witness is

possible impeachment material that must be turned over under *Brady*." *Bell v. Bell*, 512 F.3d

223, 233 (6th Cir. 2008)(citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)). The

existence of less formal, implicit, or tacit understandings between the prosecution and a witness

is also subject to *Brady's* disclosure requirements. *Bell*, 512 F.3d at 233. If Petitioner could

prove that the prosecution and any of its witnesses had a mutual understanding, albeit implicit or

tacit, such an agreement would qualify as favorable impeachment evidence under *Brady*. For the

reasons below, the record does not demonstrate the existence of such evidence.

### i. Leniency for Mitchell Merrill (Pet. Issue V)

Petitioner claims to have discovered new evidence that materially affects the credibility

of prosecution witness Mitchell Merrill. At trial, Merrill, who was incarcerated at the time on

unrelated charges, testified that he received no favorable consideration for giving information to

the police, and that his cooperation actually placed him in a worse position, protective custody.

As Merrill testified, he served his entire sentence, plus an additional day.  Detective Robert

Cantlon testified that Merrill did not request any favorable treatment in return for his

cooperation.

After the conclusion of his trial, Petitioner discovered evidence that the Troy police had

written a letter, prior to Petitioner's trial, requesting leniency on behalf of Merrill for his

cooperation.  The letter stated:

> The information given to the Troy Police Department will be directly responsible
> for a warrant and arrest of a known suspect in the murder of a Troy resident.  This
> is brought to your attention as it is a service to this community for Mr. Merrill to
> come forth with this information . . . The information given to the Troy Police
> Department will be directly responsible for a warrant and arrest of a known
> suspect in the murder of a Troy resident.

App. N to Pet.  Petitioner argues that this letter was contrary to Merrill's and Cantlon's testimony

at trial.  Petitioner claims that the fact that the police had requested, before trial, leniency for

Merrill was material impeachment evidence subject to disclosure under *Brady*.

Merrill initially requested "work release" in exchange for his cooperation.  Although his

request was denied, this letter demonstrates that the police eventually recommended favorable

treatment to Merrill's sentencing judge.  This sequence of events establishes that there was a

request for work release in exchange for cooperation, followed by a denial of work release,

followed by a general recommendation of favorable treatment.  There is no clear evidence of a

'mutual understanding.'  "A witness's expectation of a future benefit is not determinative of the

question of whether a tacit agreement subject to disclosure existed."  *Bell*, 512 F.3d at 233.

Although Merrill may have been seeking more lenient treatment in his own case, "we find no

evidence of a corresponding assurance or promise."  *Id*.

### ii. Leniency for Kirk and Klavinger (Pet. Issue IX)

Petitioner offers newly discovered evidence that the prosecution suppressed material impeachment evidence concerning the leniency two state witnesses, Roger Kirk and Peter Klavinger, allegedly received for their testimony against Petitioner.

At the time of the trial, Klavinger was incarcerated on unrelated charges. Klavinger testified that Petitioner had asked him for the victim's home address. He also told Petitioner that the victim raped Petitioner's girlfriend. Klavinger testified that Petitioner told him that Petitioner was going to burn down the victim's home and rob him. Kirk testified at trial that he observed Petitioner in possession of the murder weapon before the murder, but never saw it again after the murder. He also identified the murder weapon in court as the knife he saw Petitioner with before the murder.

Both witnesses denied receiving any favorable consideration for their testimony. Klavinger testified that he never requested "any kind of deals or arrangements, or anything." Tr. III 162. Although he admitted that he had requested to be placed on a tether for his cooperation, he stated that he eventually received nothing in return for his willingness to testify for the prosecution. Likewise, Kirk testified at trial that there were no deals or understandings relating to his testimony, that he came forth because he "felt bad for the older man," that his parole was revoked as a result of his cooperation and that "[i]f [he] would have kept [his] mouth shut, [he] would have been free right now." Tr. IV 202.

In November 2004, several years after the conclusion of his trial, Petitioner filed a motion before the trial court for the discovery of withheld or suppressed evidence in the State's possession. In response, the prosecutor turned over two letters written to the Michigan Parole Board only six days after Petitioner's conviction recommending leniency for Kirk and Klavinger. The State did not release these two letters on direct appeal in response to appellate defense

counsel Linda Borus' request for all material evidence, when it turned over the letter written for

Mitchell Merrill.  The prosecution instead delayed turning over these two letters until Petitioner's

motion for discovery fourteen years later.  The letters for each witness were substantively

identical:

> The records of this prisoner should include that he voluntarily provided
> information and testimony which assisted in obtaining a First Degree Murder
> conviction of an individual who kidnapped a 71 year old (sic) man, embedded a
> knife in his head, and then dismembered and mutilated his body.  I am not
> requesting that the Board should overlook other criteria or the statutory
> requirements for release of this prisoner.  My intention is to make you aware of
> his cooperation with law enforcement in this case.  All decisions in this matter
> remain for your discretion pursuant to law.

App. U to Pet.

Petitioner argues that these two letters reveal that Kirk and Klavinger did receive

favorable consideration for their testimony, and that there was an implicit deal or understanding.

"[I]t is not the case that, if the government chooses to provide assistance to a witness following a

trial, a court must necessarily infer a preexisting deal subject to disclosure under Brady." *Bell*,

F.3d 223 at 234.  In *Bell*, the court found that the petitioner had relied too heavily on the

prosecutor's "subsequent decision to transmit a letter to the parole board." *Id*. at 233.  The fact

that a request for leniency is written after a trial certainly does not preclude the possibility that

there was a mutual understanding prior to conviction, but the letter only demonstrates the

possibility that the prosecutor intended to request favorable consideration, not that a mutual

understanding was in place.  Petitioner has not adequately shown the existence of a mutual

understanding between the prosecution and witnesses Kirk and Klavinger concerning their

testimony at trial.  "Without an agreement, no evidence was suppressed, and the state's conduct,

not disclosing something it did not have, cannot be considered a *Brady* violation." *Id*. at 234

15

(*quoting Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002)).  This Court therefore denies relief on this claim.

### iii. Mitchell Merrill's Alleged Informant Status (Pet. Issue VI)

Petitioner claims that the prosecution withheld material impeachment evidence that prosecution witness Mitchell Merrill was a police informant, a friend of Detective Robert Cantlon's, and that the prosecution may have been feeding Merrill information concerning Petitioner's case.  As discussed above, Mitchell Merrill testified that Petitioner confessed to the murder of Morningstar and that Petitioner admitted to calling 911 on the day of the murder to ask for directions to Morningstar's residence.  Merrill testified that his motivation for cooperating with the prosecution was that Petitioner had done a "bad thing," and that he did not make up the story because of Petitioner's apparent romantic overtures towards Merrill's girlfriend.

Several years subsequent to Petitioner's conviction, Petitioner met inmate James Craig Cristini at the Bellamy Creek Correctional Facility prison law library.  Incidentally, Petitioner and Cristini were researching aspects of their respective murder convictions when Petitioner discovered that Merrill had also testified against Cristini in his trial for first degree murder in Macomb County Circuit Court (Case No. 94-2485).  Each of their cases was handled by Detective Cantlon of the Troy police[1].  In Cristini's case, Merrill claimed in an interview with police that Cristini had confessed to committing the murder.  Merrill later contradicted his interview when he testified at Cristini's preliminary examination that he worked for Detective Cantlon, that they were friends, and that Cantlon induced him to offer his original statements to police and told him what to say and in exchange he "would get out of prison."  At Cristini's preliminary examination, Merrill stated under oath "Sergeant Robert Cantlon of the Special

---

[1] Petitioner mentions in his brief that the facts surrounding these two murder cases- the way the victims were mutilated and burned, and the geographic location of the murders- are strikingly similar.

Investigation Unit in Troy informed me about what Jimmy [Cristini] did.  He said it would be in my best interest if I told some things on Jimmy."  App. P to Pet.  Merrill also testified at the preliminary examination that Cantlon had fed information to him in a previous murder case.  *Id.*

Petitioner argues that Merrill's testimony in the Cristini case about his relationship with Detective Cantlon suggests that Merrill was a "veteran informant" for Detective Cantlon.  Considering the unspecified murder case Merrill alluded to in his testimony at Cristini's preliminary examination, Merrill apparently testified for the prosecution in at least three Troy murder cases within a two-year period.  In Petitioner's view, this timeline, along with Merrill's testimony that he is a friend of Detective Cantlon and that Cantlon had fed him information in Cristini's murder case, suggest Merrill was an informant for Cantlon at the time of Petitioner's trial.

### 3. Introduction of False Testimony (Pet. Issues IV and VIII)

The trial court admitted into evidence a 911 tape recording of someone asking for directions to the victim's home only hours before the murder.  Detective Dennis Bobby of the Troy Police Department testified at trial that in July or August of 1992, he was contacted by Mitchell Merrill, who had been incarcerated in the Macomb County Jail with Petitioner at the time as Petitioner's cellmate.  Though Merrill initially contacted Detective Bobby for the purpose of discussing an unrelated breaking and entering case, he also told Detective Bobby that he had information concerning the murder of Morningstar.  Merrill told Detective Bobby that, while in jail, Petitioner admitted to calling 911 shortly before the murder in order to obtain directions to the victim's residence.  After hearing Merrill's statements, Detective Bobby prepared a written statement, which he and Merrill both signed.  Petitioner points out that the statement makes no mention of a 911 call.  *See* App. F to Pet.

Petitioner claims that on March 31, 1992, approximately one month after the murder, Detective Robert Cantlon questioned Petitioner concerning the 911 call.  Contrary to Petitioner's allegations, the Troy police claim that the interview was never recorded.  *See* App. T to Pet. Detective Bobby testified that he had no knowledge of the 911 call prior to Merrill coming forth with the information.  Detective Cantlon also testified that the police had no knowledge of the call until Merrill came forth with the information.  Petitioner argues that the record clearly contradicts this testimony.

Petitioner argues that the trial record demonstrates the existence of the 911 tape was known long before Merrill came forth, undermining the prosecution's theory that Merrill's testimony was based on what Petitioner told him, rather than fabricated by the police.  First, Petitioner argues that if Merrill had actually known [from Petitioner] about the 911 call, then his signed written statement would have mentioned it.  Second, Petitioner suggests that his own interview, for which no record exists, which allegedly occurred five months prior to Merrill's interview, proves that the police knew about the existence of the 911 call, and that they did not originally receive the information from Merrill.  Petitioner also points out that the testimony of the 911 operator as well as Troy Police Communications Supervisor Sergeant Pillen, clearly suggest that the police had knowledge of the 911 call prior to Merrill coming forth.

Prosecutors may not deliberately deceive a court or jurors by presenting known false evidence, nor allow unsolicited false evidence to go uncorrected.  *See Giglio*, 405 U.S. at 150. "To prevail on a false testimony claim, [a habeas petitioner] must show (1) that the prosecution presented false testimony, (2) that the prosecution knew was false, and (3) that was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005).  The testimony must be indisputably false rather than merely misleading, or the result of confusion, mistake, or faulty memory.  *See*

*id.* "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *United States v. Lochmondy*, 890 F2d. 817, 822 (6th Cir. 1989).

### a. Police Testimony Concerning the 911 Call

Petitioner identifies as perjured testimony (1) Detective Bobby's trial testimony that he was certain that the first time he had heard of the 911 call was after Merrill came forth, and (2) Detective Cantlon's trial testimony that the police did not know of the existence of the call until Merrill came forth, and that at that time the information was investigated and discovered.

Upon review of the record, the testimony that Petitioner challenges, while somewhat inconsistent, is not "indisputably false." Sergeant Pillen did not contradict Detective Bobby's testimony when he testified that Detective Bobby told him to retrieve the 911 recording on August 22, *five days prior* to the date on which the Troy police interviewed Merrill. The transcript indicates that Pillen could not recall the date but that according to the evidence tag on the tape, dated August 26, 1992, that was the date Detective Bobby told him to pull the tape. Tr. Vo. III, p. 29. The portion of the transcript which states August 22 has a (sic) next to the date, indicating that the August 22 date was not correct. Petitioner claims that this inconsistency was not resolved by defense counsel on cross-examination and it was never demonstrated whose testimony was more accurate. The fact that Merrill's signed and written statement does not mention the 911 call, while questionable, does not itself render Bobby's in-court testimony indisputably false.

Detective Bobby's testimony that he was not aware of the recording until after meeting with Merrill is not "indisputably false." He testified that on August 25, 1992, he interviewed Merrill who told him about the 911 call by Petitioner. Detective Bobby informed Detective Cantlon about Merrill's statements regarding the Morningstar murder because it was Detective

Cantlon who was the lead detective of the Morningstar murder.  Both Detectives Bobby and

Cantlon went to the jail on August 26, 1992 to further interview Merrill.  Tr. Vol. III, pp. 214-

216.  Detective Bobby testified that either sometime on August 26 or August 27, he called the

911 officers to look for the 911 tape on the day of the murder.  *Id.*

Detective Cantlon's testimony that he was not aware of the phone call before Merrill

came forth, nor aware of "anyone" else who knew of the call's existence, was not false.  Cantlon

testified that he was not aware of anyone else who knew of the existence of the 911 call; he did

not assert, as a matter of fact, that no else knew.  Cantlon testified that it was around August 25th

that he learned about the 911 call from Merrill.  Tr. Vol. IV, pp. 260, 287.  For the testimony to

be indisputably false, it must be shown that Cantlon was clearly aware that others knew the

recording existed before Merrill came forth.  Petitioner has not offered any evidence sufficient to

conclude that Cantlon knew about the 911 tape before Merrill told him about the 911 call.

Because Petitioner has failed to satisfy the "indisputably false" standard regarding Cantlon's

testimony, his false testimony claim must fail and does not warrant relief.

### b. Kirk's trial identification of the murder weapon

Petitioner also identifies as perjured testimony Roger Kirk's positive identification of the

murder weapon as the knife he had seen in Petitioner's car prior to the murder.  Petitioner claims

that the fact that the police had seized a similar knife from Petitioner's residence following the

murder renders Kirk's positive identification at trial "false testimony."

Petitioner must show that Kirk's trial testimony was "indisputably false," and not 'merely

inconsistent.'  On the record before the Court, Petitioner cannot make such a showing.  In order

to show that Kirk's identification of the knife was indisputably false, Petitioner must prove that

the confiscated knife was indisputably the knife that Kirk observed prior to the murder.  While

the record does suggest that Kirk might have identified the confiscated knife had it been adduced at trial, there is certainly no indisputable evidence that it was in fact the knife that Kirk observed. This claim must therefore fail.

### C. Ineffective Assistance of Trial Counsel (Pet. Issues I and II.A.)

Petitioner argues that he was denied the effective assistance of trial counsel as a result of: (1) trial counsel's failure to investigate certain aspects of the case, which caused trial counsel to be wholly unaware that the prosecution had held identification procedures outside of Petitioner's presence involving the murder weapon, a gun allegedly stolen from the victim's home, and Petitioner's voice on a 911 call; (2) trial counsel's failure to file a motion to suppress the identification; and (3) trial counsel's failure to present certain evidence at trial that was potentially favorable to Petitioner's defense.

Petitioner must satisfy a two-pronged test in order to make a showing of ineffective assistance of trial counsel, as set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, a petitioner must show that trial counsel's performance was deficient, which requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Id.* Second, a petitioner must show that counsel's deficiency actually prejudiced the defense. *Id.*

To satisfy the first prong, a petitioner must demonstrate acts that were "outside the wide range of professionally competent assistance." *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* At 690. The petitioner must overcome the presumption that the challenged actions might be considered sound trial strategy. *Id.* 689.

To establish prejudice under the second prong, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Id*.

### 1. Failure to Investigate Pretrial Identification Procedures

Petitioner alleges that in several instances defense counsel failed to investigate key aspects of Petitioner's case. In particular, Petitioner alleges that defense counsel's failure to investigate prosecution witnesses caused him to be unaware of several identification procedures conducted by the State after the appointment of trial counsel and prior to Petitioner's preliminary examination. The identification procedures consisted of the following: (1) Roger Kirk's identification of the murder weapon; (2) Roger Kirk's identification of a gun allegedly stolen from the victim's home; and (3) Lori Cunningham's identification of Petitioner's voice on a 911 call in which the caller asked for directions to the victim's home on the morning of the murder. Petitioner's argument is premised on the alleged illegality of the identification procedures due to the suggestiveness of the procedures, and the fact that the procedures were conducted without trial counsel present. In Petitioner's view, had trial counsel investigated and become aware of the procedures, he could have raised several meritorious objections at trial.

Defense counsel must undertake a reasonable investigation into the facts of a defendant's case or make a reasonable determination that such investigation is unnecessary. *Strickland*, 466 U.S. at 691. The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "A purportedly strategic decision is not objectively reasonable

'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Id.* (internal citations omitted).

To the extent that Petitioner bases his 'failure to investigate' claim on the view that the identification procedures were illegal, the claim must fail. For the reasons discussed in the analysis of Petitioner's prosecutorial misconduct claims, *supra*, Petitioner was not entitled to the presence of counsel during the procedures in question, and the procedures were not unduly suggestive. It follows that trial counsel could not have made a meritorious motion to suppress the identification procedures. Defense counsel cannot be deemed deficient for failing to make a futile objection or motion. See *McQueen v. Scroggy*, 99 F.3d 1302, 1328 (6th Cir. 1996).

Petitioner also implies that further investigation into the identification procedures would have enabled trial counsel to 'completely undermine' the prosecution witness' subsequent testimony at trial. The Court disagrees for the following reasons.

Whether or not trial counsel was aware of the identification procedures, and regardless of when he became aware, it is clear that trial counsel in fact did attempt to 'undermine' Kirk's trial testimony. At trial, counsel attempted to demonstrate through cross-examination and re-cross examination the inconsistencies between Kirk's preliminary examination and trial testimony concerning the knife. Counsel's questioning revealed that Kirk's recollection of the knife he saw in Petitioner's possession conflicted with testimony at the preliminary hearing several months prior. For instance, counsel successfully drew attention to the apparent contradiction between Kirk's preliminary examination testimony that the knife was unremarkable and that there were probably "thousands" of similar knives, and his trial testimony that the knife was "rather unique." Likewise, trial counsel attempted to undermine certain aspects of Kirk's trial testimony concerning the guns Petitioner allegedly took from the victim's home. Petitioner proffers no

evidence demonstrating that if trial counsel had become aware of the identification procedures sooner, he would have undermined Roger Kirk's trial testimony.

Petitioner likewise fails to proffer any evidence that if trial counsel had known of Lori Cunningham's pre-trial identification of Petitioner's voice on the 911 call he would have been able to undermine Cunningham's trial testimony any more than he did. Cunningham was personally acquainted with Petitioner and therefore her identification of his voice on the 911 recording could not be easily undermined.  Because there is no indication that the alleged failure to investigate impeded counsel's ability to discredit any of the prosecution's witnesses', Petitioner is unable to show prejudice under Strickland's second prong, even assuming counsel's performance was unprofessional.  Relief is therefore not granted on this claim.

### 2. Failure to Object to Identification Procedures (Pet. Issue II.A)

Petitioner argues that trial counsel was ineffective for failing to object to the introduction of testimony or evidence stemming from the "illegally held identification procedures," in particular identification procedures concerning Kirk's identification of the murder weapon. Petitioner urges, "[a]fter Petitioner was in custody and appointed counsel, the mere fact that the government held such procedures, without counsel present, would have rendered such a motion successful."  Pet. at 42.

As discussed above, the identification procedures in question were not illegal.  It is unclear to what extent, if any, Kirk's trial evidence or testimony 'stemmed' from the pre-trial identification procedures.  In any event, because the procedures did not violate Petitioner's constitutional rights, any objection to evidence stemming from the procedures would have been non-meritorious.  "Defense counsel cannot be deemed deficient for failing to make a futile

objection or motion." *See McQueen*, 99 F.3d at 1328. This court therefore denies relief on this claim of ineffective assistance of counsel.

### 3. Failure to Present Evidence (Pet. Issue III)

Petitioner claims that, immediately preceding his direct appeal, he learned of the existence of exculpatory evidence, which had been in defense counsel's file and which counsel failed to present at trial. Petitioner discovered in defense counsel's file evidence that, following the murder, the police had seized by warrant a knife from Petitioner's residence which Petitioner claims was "uncannily similar" to the murder weapon, and generally matched Kirk's description of the knife he saw in Petitioner's possession. Petitioner argues that this evidence would have undermined Kirk's identification of the murder weapon as the knife he saw in Petitioner's possession before the murder. For the reasons discussed below, trial counsel's failure to make any use of this evidence was constitutionally deficient; however, the Court cannot conclude that such deficiency actually prejudiced Petitioner's defense.

### a. Performance

As noted above, Roger Kirk's testimony was somewhat contradictory at several points. At the preliminary examination, Kirk initially testified that the knife he saw in Petitioner's possession had jagged edges. By contrast, he later testified at trial that he was sure that the knife, like the murder weapon, had no jagged edges. Although at the preliminary examination, Kirk suggested that the knife he had seen in Petitioner's car was the same one Kirk saw in Petitioner's possession following the murder, at trial he testified positively that he had never seen the first knife again. At the preliminary examination, Kirk suggested the knife he saw Petitioner with was very common or unremarkable; however, at trial, he suggested that the knife was highly distinctive. In light of the apparent inconsistencies in Kirk's testimony, as well as the fact that

Kirk's testimony was the only direct evidence linking Petitioner to the murder weapon, it was not reasonable for trial counsel to fail to explore this potential means of undermining Kirk's testimony. Any suggestion that offering the knife into evidence might have prejudiced Petitioner by merely linking him to yet another dangerous weapon is unpersuasive as it was already established that Petitioner was linked to several dangerous weapons.

### b. Prejudice

Notwithstanding the apparent inconsistencies in Kirk's recollection of Petitioner's knife, as well as the fact that the murder weapon and the confiscated knife appear to be somewhat similar, Petitioner cannot show that there is a "reasonable *probability*" that the result of the proceeding *would* have been different but for counsel's errors. To be certain, there is a reasonable *possibility* that Kirk *might* have testified differently if he had been confronted with evidence of the confiscated knife. For instance, Kirk might have testified that in fact the confiscated knife was the knife he saw in Petitioner's car. At a minimum, if offered into evidence, the confiscated knife could have served as an additional means to test Kirk's certainty about whether the knife he saw Petitioner with was in fact the murder weapon. It is also possible, however, that viewing the confiscated knife would have made Kirk more confident that the confiscated knife was different from the knife he testified to seeing Petitioner with, bolstering the theory that the murder weapon belonged to Petitioner. In any event, a reasonable *possibility* of a different outcome is not sufficient to satisfy the prejudice prong under *Strickland*. Relief, therefore, is denied with respect to this claim.

Petitioner relies heavily on the fact that the lab reports demonstrate that the murder weapon and the confiscated knife were roughly similar - both had large wooden handles and both lacked jagged edges. This rough similarity, however, establishes only the possibility, not the

probability, that Kirk would have testified differently and in turn caused the outcome of the trial

to change.  Because Kirk was never made to observe the confiscated knife, we are left only to

speculate as to how Kirk's testimony might have changed.

Because Petitioner cannot demonstrate a reasonable probability that but for counsel's

error the result of the proceedings against him would have been different, Petitioner's request for

relief must be denied.

### D. Ineffective Assistance of Appellate Counsel (Pet. Issues V and X)

Petitioner makes two claims of ineffective assistance of appellate counsel: (1) appellate

counsel failed to supplement Petitioner's brief on appeal with evidence, discussed above, that the

Troy police wrote a letter to the sentencing judge in prosecution witness Mitchell Merrill's

unrelated case; and (2) appellate counsel failed to raise issues I through V, and VIII in

Petitioner's brief in support for habeas relief.  For each claim, Petitioner argues that appellate

counsel failed to raise "dead bang winners" on appeal.

The right to the effective assistance of counsel includes the right to effective assistance of

appellate counsel on direct appeal.  *See Evits v. Lucey*, 469 U.S. 387, 396 (1985).  A criminal

defendant does not have a right to demand that appellate counsel raise every possible issue on

appeal.  *Id*. at 394  "[W]innowing out weaker arguments on appeal and focusing on those more

likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate

advocacy."  *Smith v. Murray*, 477 US 527, 536 (1986)(internal citation omitted).  However,

appellate counsel may be deemed ineffective for omitting a "dead bang winner," an issue from

the trial record that would obviously result in reversal.  See *Meade v. Lavigne*, 265 F. Supp. 2d

849, 870 (E.D. Mich. 2003).

A petitioner may establish ineffective assistance of appellate counsel by demonstrating that counsel ignored a significant and obvious issue while pursuing weaker claims. *See Carpenter v. Mohr*, 163 F.3d 938, 947 (6th Cir. 1998) (*citing* Fagan v. Washington, 942 F.2d 1155, 1157 (7th Cir. 1991)). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Appellate counsel cannot be deficient for failing to raise an issue that lacks merit. *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008).

### 1. Ineffective Assistance for Failing to Raise Issues (Pet. Issues I-V and VIII)

Petitioner argues that appellate counsel was deficient for failing to raise the prosecutorial misconduct and ineffective assistance of trial counsel claims, issues I-V in Petitioner's brief, discussed above: "Arguably, these issues which Petitioner raises within this brief are 'stronger' than those appellate counsel raised in Petitioner's direct appeal." Pet. at 99. For the reasons discussed above, each of those claims, far from "dead bang winners," as Petitioner suggests, is without merit. Petitioner's ineffective assistance of appellate counsel claims as to those arguments that are without merit must therefore fail.

Regarding the claim that the prosecution suppressed evidence of an alleged implicit deal between the police and witness Mitchell Merrill (Argument V), Petitioner claims that appellate counsel's failure to raise this argument on appeal resulted from counsel's failure to comply with a page requirement under MCR 7.212(B). Appellate counsel attempted to supplement Petitioner's brief on direct appeal in order to include this argument, but the Court of Appeals denied the motion without explanation. *See* Appendix C to Pet. Even assuming that the Court of Appeals denied the motion to amend because of the page limitation, and that this oversight

constituted ineffective performance on the part of appellate counsel, the argument regarding Mitchell Merrill's alleged informant status ultimately lacked merit, as discussed above, and therefore there can be no prejudice under Strickland's second prong.  Appellate counsel cannot be ineffective for failing to raise an issue that lacks merit.  See *Mahdi*, 522 F.3d at 638.

### E.  Newly Discovered Evidence of Actual Innocence

Petitioner offers what he claims to be new exculpatory evidence of possible state misconduct, and requests a new trial or, in the alternative, an evidentiary hearing to determine the veracity of such evidence.  Specifically, Petitioner offers Joan Krasnicki's recantation of her trial testimony against Petitioner.  Krasnicki also avers by way of affidavit that she was coerced by the police into testifying for the prosecution.

At the time of trial, Krasnicki was Petitioner's ex-girlfriend.  Krasnicki had received financial assistance from the victim while Petitioner was in prison.  Krasnicki testified that Petitioner was jealous and possessive.  After the victim had refused Petitioner a ride in his car, Petitioner allegedly stated, "he said no to the wrong person for the last time."  Tr. Vol. III at 231. She testified that after the murder and after the police identified the original suspects, Petitioner told her that the police had the wrong person in custody.  Krasnicki also wore a wiretap for the police, which at trial revealed that Petitioner stated that the victim 'got what he deserved.'  *Id*. at 239.

In 2004, Krasnicki recanted her trial testimony and written statements by way of a personal letter to Petitioner, which was subsequently put into affidavit form and signed. Krasnicki claimed that the Troy police threatened to charge her as an accessory to the murder and take away her children if she did not cooperate, and that the police coached her on how to testify.  *See* Appendix S to Pet.  Krasnicki averred that her reason for coming forth was to "clear

this burden from [her] conscience." *Id*. Petitioner argues that this newly discovered recantation evidence is a sufficient basis for granting relief, or in the alternative an evidentiary hearing.

This court must apply the standard announced by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298 (1995), to determine whether the new recantation evidence warrants a new trial. Under *Schlup*, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." 513 U.S. at 327. The court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006).

In the case at hand, Krasnicki's recanting affidavit is not sufficient to show that no reasonable juror would have convicted Petitioner in light of this new evidence. Notwithstanding Krasnicki's recantation, a reasonable juror could have still convicted on the basis of the testimony of several witnesses that Petitioner confessed to the murder, Roger Kirk's testimony that he observed Petitioner with the murder weapon prior to the murder, as well as Lori Cunningham's identification of Petitioner's voice on a 911 call in which the caller asked for directions to the victim's home on the day of the murder.

 "[A]ffidavits by witnesses recanting their trial testimony are to be looked upon with extreme suspicion." *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007)(*quoting United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001)). In *McCray*, the petitioner offered in support of his actual innocence claim the recantation of an eye-witness who testified at trial that he saw the petitioner murder the victim. *McCray*, 499 F.3d at 573. The witness subsequently recanted his trial testimony by affidavit, claiming that he did not actually see who committed the murder, his testimony was coerced, and that he testified in order to avoid charged in connection with the

murder.  *Id*. at 568.   The court in *McCray* did not find the recantation evidence sufficient to support an actual innocence "gateway" claim, noting that, unlike cases in which recantation evidence did support an actual innocence claim, the petitioner provided "no evidence casting sufficient doubt on [the recanting witness's] [original] testimony so as to ensure that no reasonable juror would have convicted [the petitioner] of the crime."  *See id*. at 576.  By contrast, the Sixth Circuit recognized the petitioner's gateway claim where the petitioner offered the recantations of two expert witnesses whose original testimony was central to the petitioner's conviction.  *See Souter v. Jones,* 395 F.3d 577, 596-97 (6th Cir. 2005).

Here, the evidence that Petitioner has offered to cast doubt on Krasnicki's testimony is arguably weaker than that offered by the petitioner in *McCray*.  It also does not appear that Krasnicki's testimony was extremely central to Petitioner's conviction, in contrast to *Souter*.  Petitioner concedes in his brief that "without the testimony of Krasnicki there was still, at the time of trial, enough evidence left to convict."  Petitioner argues, however, that in light of Krasnicki's recantation, along with the other arguments in support of his petition, relief is still appropriate (he specifically mentions arguments II, IV, V, VI, and IX).  As discussed above, each of these claims lacks merit, and therefore hardly adds any strength to this recantation evidence.  Because Petitioner has failed to demonstrate that no reasonable juror could have convicted in light of this newly presented evidence, this actual innocence claim must fail and does not warrant relief.

### F. The State Courts' Failure to Provide a Full and Fair Hearing on Post-Conviction Claims; Refusal to Expand the Record; Failure to Hold an Evidentiary Hearing on Newly Discovered Evidence; Failure to Apply *Schlup v. Delo* to Actual Innocence Claims (Pet. Issue XI)

Petitioner asserts that the state courts erred by refusing to expand the record at the post-conviction stage, failing to hold an evidentiary hearing on his newly discovered evidence, and by

failing to apply *Schlup v. Delo* to his actual innocence claims.  Petitioner argues that these

denials have led to a deprivation of a full and fair post-conviction hearing and a miscarriage of

justice.

As for the state courts' failure to expand the record, failure to apply *Schlup*, and failure to

hold an evidentiary hearing, such questions are matters of state law.  Because a federal habeas

court may not correct a state court's misapplication of its own law, a state trial court's denial of a

motion for a new trial based on newly discovered evidence is not a ground for habeas relief.

*Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986); *Monroe v. Smith*, 197 F.Supp.2d 753, 763

(E.D. Mich. 2001).  Given that this Court finds Petitioner is not entitled to habeas relief, any

alleged errors of state law have not led to a miscarriage of justice.

**G.  Evidentiary Hearing (Pet. Issue VII)**

Petitioner requests an evidentiary hearing on each of his claims for relief in order to

develop certain underlying facts he insists are essential for the resolution of such claims.  For the

following reasons, Petitioner is not entitled to an evidentiary hearing.

28 U.S.C. § 2254(e)(2) prevents a federal habeas court from granting evidentiary

hearings where a petitioner has "fail[ed] to develop the factual basis of a claim in State court

proceedings."  The Supreme Court explained that "a failure to develop the factual basis of a

claim is not established unless there is lack of diligence, or some greater fault, attributable to the

prisoner or the prisoner's counsel."  *Williams v. Taylor,* 529 U.S. 420, 432 (2000).  "Diligence

for purposes of the opening clause depends upon whether the prisoner made a reasonable

attempt, in light of the information available at the time, to investigate and pursue claims in state

court."  *Id*. at 435.  "Diligence will require in the usual case that the prisoner, at a minimum, seek

an evidentiary hearing in state court in the manner prescribed by state law."  *Id.* at 437.  "[T]he

fact that [a petitioner] is not disqualified from receiving an evidentiary hearing under §

2254(e)(2) does not entitle him to one." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003).

The Sixth Circuit has held that "a habeas petitioner is generally entitled to such a hearing if he

alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not

hold a full and fair evidentiary hearing." *Id*. (*quoting Sawyer v. Hofbauer*, 299 F.3d 605, 610

(6th Cir. 2002)). "Even in a death penalty case, 'bald assertions and conclusory allegations do

not provide sufficient ground to warrant requiring the state to respond to discovery or to require

an evidentiary hearing.'" *Stanford v. Parker*, 266 F3d 442, 460 (6th Cir. 2001) (internal citation

omitted).

Petitioner claims that Merrill's informant status is material impeachment evidence subject

to disclosure under *Brady*. The Supreme Court held that all three elements of a *Brady* claim

were satisfied where the prosecution failed to disclose the informant status of one of its key

witnesses. *Banks v. Dretke,* 540 U.S. 668, 704 (2004). In *Banks*, the petitioner presented newly

discovered evidence that the prosecution suppressed a witness' status as a paid informant for the

police after the petitioner successfully demonstrated that he was entitled to an evidentiary

hearing. *See id.* at 678. In the present case, Petitioner offers evidence that Merrill might have

had an informant relationship with Cantlon *subsequent* to his own conviction. Petitioner proffers

no evidence that would prove that Merrill worked as an informant for Cantlon *at the time of*

Petitioner's case. The evidence Petitioner relies on in support of his allegation that Merrill was

an informant for Detective Cantlon is unique in that it rests primarily on Merrill's actions

following Petitioner's trial. Petitioner is not merely alleging a "bald assertion." Merrill testified

in a subsequent case, under oath, that he had an informant-like relationship with Detective

Cantlon, that he and Cantlon were "friends," and that Cantlon essentially fed Merrill information

to offer against Cristini in another case.  Merrill also testified that he had cooperated with

Cantlon in connection with an unspecified murder case prior to Cristini's case.  These factual

allegations raise not only the question of whether there existed an informant relationship between

Cantlon and Merrill, but also whether such a relationship existed at the time of Petitioner's trial.

If believed, the allegation that Merrill was an informant for the lead detective in Petitioner's case

might very well undermine confidence in the outcome of Petitioner's trial.  However, as

discussed above, the Court finds that all of Petitioner's claims for relief lack merit.   The Court is

satisfied that the resolution of Petitioner's claims for relief do not require the development of any

questions of fact.

## VI. CERTIFICATE OF APPEALABILITY

A petitioner must receive a certificate of appealability ("COA") in order to appeal the

denial of a habeas petition for relief from either a state or federal conviction.  28 U.S.C. §

2253(c)(1)(A), (B).  A court may issue a COA "only if the applicant has made a substantial

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a federal district

court rejects a habeas claim on the merits, the substantial showing threshold is met if the

petitioner demonstrates that reasonable jurists would find the district court's assessment of the

constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).

"A petitioner satisfies this standard by demonstrating that . . .  jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537

U.S. 322, 327 (2003).  In applying this standard, a district court may not conduct a full merits

review, but must limit its examination to a threshold inquiry into the underlying merit of the

petitioner's claims.  *Id.* at 336-37.  When a federal district court denies a habeas claim on

procedural grounds without addressing the merits, a certificate of appealability should issue if it

is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85.

Here, the Court concludes that jurists of reason could find the Court's assessment of Petitioner's *Brady* claim as it relates to the relationship between Merrill and Detective Cantlon may be debatable or wrong. The Court further finds that jurists of reason could find that the Court's conclusions regarding the testimony recanted by the witness may be debatable or wrong. The Court therefore issues Petitioner a certificate of appealability on these two claims only.

A court may grant *in forma pauperis* status if the court finds that an appeal is being taken in good faith. *See* 28 U.S.C. § 1915(a)(3); Fed. R. App. 24 (a); *Foster v. Ludwick*, 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002). Any appeal of this order will be taken in good faith. The Court will grants any request by Petitioner to proceed *in forma pauperis* status on any appeal filed.

## VII. CONCLUSION

For the foregoing reasons,

IT IS ORDERED that the petition for writ of habeas corpus (Doc. No. 1) is DENIED.

IT IS FURTHER ORDERED that a certificate of appealability issue in this matter on the two claims noted above.

IT IS FURTHER ORDERED that Petitioner may proceed *in forma pauperis* on any appeal filed.

IT IS FURHTER ORDERED that this action is DISMISSED with prejudice.

s/Denise Page Hood_____
United States District Judge

DATED:   September 30, 2011

I hereby certify that a copy of the foregoing document was served upon William Smith #200445, 1500 Caberfae Highway, Manistee, MI 49660 and  counsel of record on September 30, 2011, by electronic and/or ordinary mail.

<u>s/LaShawn R. Saulsberry</u>
**Case Manager**